IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JARNETT LONO,<br><br>         Plaintiff,<br><br>  vs.<br><br>HAWAII PACIFIC UNIVERSITY,<br><br>         Defendant. | CIV. NO. 22-00400 JMS-WRP<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 44 |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF NO. 44

### I. INTRODUCTION

Defendant Hawaii Pacific University ("Defendant" or "HPU") moves for summary judgment in this suit brought by Plaintiff Jarnett Lono ("Plaintiff" or "Lono") who works at HPU as the Women's Softball Head Coach.  Lono alleges that she was unlawfully paid less than similarly-situated male coaches at HPU. Counts I, III and IV of Lono's Complaint allege violations of federal and state laws mandating equal pay for equal work, including the Equal Pay Act, 29 U.S.C. § 206(d)(1) ("EPA"), Hawaii Revised Statutes ("HRS") § 378-2.3 ("Equal pay"), and HRS § 387-4 ("Wage discrimination prohibited").  ECF No. 1 at PageID.15–16, 18–21.  Counts II and V allege violations of federal and state laws proscribing employment discrimination, Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e et seq., and HRS § 378-2 ("Discrimination practices made unlawful").

ECF No. 1 at PageID.16–18, 21–22.  Counts VI and VII allege retaliation claims

under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) and HRS § 378-62

("Discharge of, threats to, or discrimination against employee for reporting

violations of law").  ECF No. 1 at PageID.23–25.

  Construing the evidence in the light most favorable to Plaintiff, there

are disputes of material fact precluding dismissal of Counts I–V.  For the reasons

explained further below, the court DENIES Defendant HPU's Motion for

Summary Judgment, ECF No. 44, as to Counts I–V, but GRANTS the Motion as to

Counts VI and VII.

## II. <u>BACKGROUND</u>

### A. **Factual Background**

  Lono is an HPU graduate and has been working as a volunteer or

assistant coach for the HPU Women's Softball program since 2000, around twenty

hours a week.  ECF No. 55-2 at PageID.702–3.  In 2016, Lono was hired for a paid

position, as part-time Women's Softball Assistant Coach under the supervision of

Head Coach Bryan Nakasone.  *Id.* at PageID.703.  Just over a year later, on

September 16, 2017, Lono was promoted to part-time Co-Head Coach with

Nakasone.  *Id.*; ECF No. 60-10 at PageID.1149.  The two Co-Head Coaches shared

the position salary of $32,000 equally, receiving $16,000 each.  ECF No. 55-2 at

PageID.703.  Lono then became the sole Head Coach upon Nakasone's retirement on June 30, 2020.  *Id.* at PageID.704.

On May 18, 2021, Lono emailed the then-Assistant Vice President of Human Resources, Susan Gray, copying the Interim Athletics Director Lauren Conching, stating that she had spoken to the former Athletics Director, Sam Moku, about receiving the full Head Coach salary just after Nakasone retired, but that she was still receiving only half of the position salary despite doing all the work.  ECF No. 45-4 at PageID.424.  Gray and Conching agreed to submit Lono's request for a pay increase to the HPU Cabinet.  *Id.* at PageID.276–277, 420–421.  Over the next month, Lono sent emails following up on the request and ultimately asked to be forwarded the HPU internal complaint process.  *Id*. at PageID.419; ECF No. 55-2 at PageID.705.  On June 23, 2021, the HPU Cabinet approved Lono's transition to full-time Head Coach and raise to $32,000.  ECF No. 45-4 at PageID.418.  Lono declined the full-time offer, because she was working full time for a state agency.  *Id.* at PageID.425; ECF No. 55-2 at PageID.704.  On July 1, 2021, Dr. Debbie Snell ("Snell") replaced Conching as the Athletic Director.  ECF No. 45-3 at PageID.236.

After Lono declined the full-time position, Gray told Lono that she could not be given full-time pay for part-time work, but asked that Lono provide her hours for the year to evaluate her compensation.  ECF No. 45-4 at PageID.410.

On July 26, 2021, Lono responded, estimating that she worked at most 785 hours during the 2020–2021 season, and again asked for the internal complaint process. ECF No. 55-44 at PageID.910–911 (Lono giving estimates of her monthly hours in ranges, the upper ends of which add up to 785 hours); *see also* ECF No. 45-4 at PageID.407.  On August 3, 2021, Gray informed Lono that her 785-hour total was less than the 988 hours that HPU requires for part-time work.  ECF No. 45-4 at PageID.407.  Gray told Lono that even though she did not work 988 hours, her part-time pay would increase to $22,803 per year or $23.08 per hour, and that she would receive $7,369.92 in back pay retroactive to July 1, 2020.  *Id.*

On August 6, 2021, Lono filed a letter of complaint with the State of Hawaii Department of Labor and Industrial Relations for unpaid wages.  ECF No. 45-4 at PageID.581–585.  She sent an email to Gray and Snell stating that she had filed this complaint, that she had engaged counsel, and that she planned to submit a complaint to the Hawaii Civil Rights Commission ("HCRC").  *Id.* at PageID.406. On January 9, 2022, Lono filed a Charge of Discrimination with the Employment Opportunity Commission ("EEOC") and the HCRC alleging that her pay was less than previous and current male coaches in violation of Title VII and the EPA.  *Id.* at PageID.562–565.

**B.    Alleged Comparators**

Lono has identified three potential comparators: her predecessor as Women's Softball Head Coach, Nakasone; Women's Volleyball Head Coach, Jenic Tumaneng; and Women's Basketball Head Coach, Reid Takatsuka.  ECF No. 54 at PageID.657–658.

In 2016–2017, Nakasone was the sole Head Coach of the Women's Softball Program and made a salary of $24,133.  ECF No. 55-5 at PageID.742.  He attests that during this time, he was working "part-time," and that the Head Coach position had historically always been a part-time position.  *Id.* at PageID.743.  In HPU's records, however, he was listed as "full time."  ECF No. 60-10 at PageID.1154.  In 2017–2018, he transitioned to a co-Head Coach position with Lono, with the plan of retiring in one or two years.  ECF No. 55-5 at PageID.742.  He attests that he proposed to the Athletic Director that he and Lono would split the Head Coach salary at $16,000 each, and the Director agreed without discussing his and Lono's respective experience as coaches.  *Id.* at PageID.743.  He retired in 2021 and Lono became sole Head Coach.  *Id.*

Tumaneng is the current Head Coach of the Women's Volleyball Program.  ECF No. 55-4 at PageID.733.  When he was hired as a coach in 2016, he received a letter from HPU confirming his salary at $35,000 per year and his status as "full-time."  *Id.*; ECF No. 55-37 at PageID.896.  At this point, he informed the

5

Athletic Director that he had another full-time job and he "believe[s] that's when [he] was classified as 'part-time.'"  ECF No. 55-4 at PageID.734.  Tumaneng attested that even though he was no longer classified as "full-time," his job duties did not change and he accomplished all duties of the Head Coach position.  *Id.* HPU claims that Tumaneng's belief was incorrect and he was always classified as "full-time," ECF No. 59 at PageID.1110–1111, but HPU appears to acknowledge elsewhere in the pleadings and in the record that he was a part-time employee as of June 2023.[1]  In August of 2023 Tumaneng received a promotion to full-time Head Coach:  He was classified as "full-time" and received an increase in his salary. ECF No. 55-4 at PageID.734.

Reid Takatsuka did not submit a declaration, but Interim Athletics Director Lauren Conching attested to facts regarding his position and salary in her declaration.  ECF No. 55-3.  Takatsuka was the Head Coach of the Women's Basketball Program at HPU.  *Id*. at PageID.725.  In academic year 2020–2021, he requested an increase in his salary from $50,000 to $75,000.  *Id.* at PageID.726. When Conching submitted Reid's request to HPU administration, it was approved

---

[1]  For example, the Memorandum in Support of HPU's Motion for Summary Judgment states that Tumaneng was a "then part-time" Volleyball Coach when he received the offer of a full-time Head Coach position.  ECF No.  44-1 at PageID.201.  And, when current Athletic Director Snell wrote to Tumaneng to offer him a full-time job in June 2023, she states he would convert from part time to full time.  *See* ECF No. 45-3 at PageID.237; ECF No. 45-11 at PageID.624.

after approximately one week.  *Id.*  HPU's records show that Takatsuka is classified as full time.  ECF No. 60-9 at PageID.1147.

## C.   Alleged Adverse Employment Actions

On July 29, 2021, three days after Lono submitted her hours report to Gray, Lono emailed the Maintenance Department, copying Snell, requesting a ladder and golf cart for a team of volunteers and staff to undertake maintenance work on the softball field on July 31, 2021 (the "Maintenance Day").  ECF No. 45-4 at PageID.612.  Snell asked if the volunteers were cleared to participate, and told Lono that, for legal reasons, only HPU employees could drive the golf cart.  *Id.* at PageID.611.  Snell also offered to help Lono schedule volunteer training.  *Id.* at PageID.609.  According to Lono, she had never had to meet these requirements before, and as a result, she had to cancel the maintenance work.  ECF No. 55-2 at PageID.710.

On June 21, 2022, Lono received her annual performance review from Snell (the "Performance Review").  She received an overall 2.8/5 or "Good Performance/Performance Meets Expectations" rating.  ECF No. 45-4 at PageID.577.  The review stated that Lono missed several meetings that were scheduled during business hours, and that Lono's athletes had told Snell that they wanted a full-time coach with more availability.  *Id.* at PageID.569, 575.  The

previous year's review was written by Conching, and Lono had received an overall

3.6/5 "Excellent Performance" rating.  ECF No. 55-54 at PageID.939–953.

### D.    Raise and Promotion

Lono filed this action on September 1, 2022.  ECF No. 1.  On

November 10, 2022, HPU announced that as of August 2023, all Head Coaches of

team sports would be "required to be full-time coaches."  ECF No. 45-4 at

PageID.433–34.  Lono was notified that her pay would increase on November 15,

2022, to $28,414.67 per year, and if she converted to full time her salary would be

$56,833.33.  ECF No. 45-4 at PageID.433.  Lono did not convert to full time.

Around June 14, 2023, Lono and Tumaneng were offered full-time Head Coach

positions.  ECF No. 45-3 at PageID.237.  Lono accepted on June 30, 2023,

effective August 1, 2023.  *Id.*

### E.    Procedural History

Lono filed this suit on September 1, 2022, having received a Notice of

Dismissal and Right to Sue from the EEOC on June 14, 2022.  ECF No. 1 at

PageID.3.  On November 17, 2023, HPU filed for Summary Judgment, ECF No.

44, and Lono opposed on January 8, 2024, ECF No. 55.  HPU submitted a reply on

January 16, 2024, ECF Nos. 59, 60.  A hearing was held on February 13, 2024.
ECF No. 64.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper when there is no genuine issue of
material fact and the moving party is entitled to judgment as a matter of law.  Fed.
R. Civ. P. 56(a).  "An issue is 'genuine' only if there is a sufficient evidentiary
basis on which a reasonable fact finder could find for the nonmoving party, and a
dispute is 'material' only if it could affect the outcome of the suit under the
governing law."  *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"The moving party initially bears the burden of proving the absence of
a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387
(9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
"Where the non-moving party bears the burden of proof at trial, the moving party
need only prove that there is an absence of evidence to support the non-moving
party's case."  *Id.* (citing *Celotex*, 477 U.S. at 325).  "When the moving party has
carried its burden . . . , its opponent must do more than simply show that there is
some metaphysical doubt as to the material facts"; instead, the opponent must
"come forward with specific facts showing that there is a genuine issue for trial."
*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586–87 (1986)

(citation, footnote, and internal quotation marks omitted).  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  *In re Oracle*, 627 F.3d at 387; *see also Anderson*, 477 U.S. at 248 (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

When considering a motion for summary judgment, the court views the facts and draws reasonable inferences in the light most favorable to the nonmovant.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  "[T]he court does not make credibility determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most favorable to the nonmoving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  Moreover, it is not the court's duty to comb through the record to determine whether the evidence unmistakably favors one side or the other—the court must instead ask whether a fair-minded jury could return a verdict for the plaintiff based on the plaintiff's presentation of the evidence.  *See Anderson*, 477 U.S. at 252.

## IV.  ANALYSIS

**A.    Counts II and V – Title VII and HRS § 378-2**

### *1.    Legal Framework*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides a "useful tool at the summary judgment stage" in addressing Title VII claims.  *See*

10

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).  Under this framework, Plaintiff has the initial burden to establish a prima facie case of discrimination.  *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (citation and quotation omitted).  To establish a prima facie case of disparate treatment under Title VII, a plaintiff must show that "(1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably."  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  "[A]n adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'"  *Id.* (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000)).  To be similarly situated, the comparator employees must "have similar jobs and display similar conduct."  *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003).  Although the employees need not be identical, they "must be similar in material respects."  *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011).

After a plaintiff establishes a prima facie showing of discrimination, the burden under the *McDonnell Douglas* framework shifts to a defendant to put forward a legitimate, non-discriminatory reason for its actions.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  A defendant's burden to articulate some

legitimate, nondiscriminatory reason for the challenged action is merely a burden of production, not persuasion. *Chuang*, 225 F.3d at 1123–24. If a defendant puts forth a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that the given reason is merely pretext for a discriminatory motive. *Boeing Co.*, 577 F.3d at 1049.[2] "A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing the employer's explanation is unworthy of credence." *Vasquez*, 349 F.3d at 641.

The Hawaii Supreme Court has also adopted the *McDonnell Douglas* framework for HRS § 378-2 discrimination cases. *Hac v. Univ. of Hawaii*, 102 Haw. 92, 101, 73 P.3d 46, 55 (2003).

## 2.   *Application*

Viewing the evidence in the light most favorable to Plaintiff, she has met her prima facie case. She is a member of a protected class (women) and was performing her job satisfactorily—she never received any review indicating that her performance was unsatisfactory overall, and she still works at HPU as Women's Softball Head Coach. ECF No. 45-3 at PageID.237. And as set forth

---

[2] "[W]hen responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *Metoyer v. Chassman*, 504 F.3d 919, 939 (9th Cir. 2007) (quoting *McGinest*, 360 F.3d at 1122) (quotation marks omitted). Here, the court proceeds under the *McDonnell Douglas* framework because the Defendant presents its arguments under this framework and Plaintiff does not appear to argue to the contrary.

below, she suffered an adverse employment event (she was paid less than her male peers), and was treated less favorably than similarly-situated employees Nakasone and Tumaneng, both male Head Coaches of women's sports at HPU who attested that they worked part-time and received full-time pay.  ECF No. 55-4 at PageID.734; ECF No. 55-5 at PageID.742–743.

       HPU argues that Lono has not established her prima facie case because the male comparators she identified are not similarly-situated.  First, HPU argues that all three male comparators are classified by HPU as full time, and therefore they all make a full-time salary for full-time work while Lono makes a part-time salary for part-time work.  ECF No. 59 at PageID.1110.  But the standard for a similarly-situated employee is not whether the employees fall under a particular classification created by the employer—it is whether they "have similar jobs and display similar conduct."  *Vasquez*, 349 F.3d at 641.  Lono argues that she fulfilled all the duties of the Head Coach position while working part time.  ECF No. 54 at PageID.659–660.  Nakasone and Tumaneng both attest that they fulfilled their Head Coach duties while working part time.  ECF No. 55-4 at PageID.734;

ECF No. 55-5 at PageID.743.  Construing the facts in the light most favorable to Lono, Nakasone and Tumaneng were similarly-situated.[3]

Second, HPU argues that Tumaneng is not an appropriate comparator because his job is not similar to Lono's.[4]  Lono has provided sufficient evidence that Tumaneng had a similar job and displayed similar conduct to rebut this argument.  This includes the position descriptions of the Volleyball and Softball Head Coach positions, which reflect identical qualifications and key responsibilities.  *See generally* ECF No. 55-22 at PageID.859–861 (Volleyball); ECF No. 55-24 at PageID.865–867 (Softball).  Lono has also provided game schedules showing that the softball team played more games than the volleyball team over the past three years.  *See generally* ECF No. 55-25, ECF No. 55-26, and ECF No. 55-27 (providing the number of volleyball games played over the past three years); ECF No. 55-31, ECF No. 55-32, and ECF No. 55-33 (softball games).  The two teams also hold a comparable number of practices.  *See* ECF No. 55-34; ECF No. 55-36.

---

[3]  Because there is no evidence in the record indicating that Takatsuka fulfilled his duties while working part time, Takatsuka did not "display similar conduct" to Lono and is thus not an appropriate comparator.  *Vasquez*, 349 F.3d at 641.

[4]  HPU argues that different sports require different coaching skills and job duties because each sport is fundamentally different.  But it is possible for jobs coaching different sports to be "substantially equal" under the Equal Pay Act and for coaches of different sports to be appropriate comparators under Title VII if the jobs themselves are similar.  *See* U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-1998-1, Enforcement Guidance on Sex Discrimination in the Compensation of Sports Coaches in Educational Institutions (October 29, 1997) at pp. 7–8.

HPU makes two additional arguments that Nakasone is not similarly-situated. It argues that Nakasone is not an appropriate comparator because he did not make more than Lono—both coaches made $16,000 when they shared the position, and "[a]fter Nakasone retired, Plaintiff received higher part-time salaries ($22,803 and $28,414.67)." ECF No. 44-1 at PageID.208. But HPU's argument is premised on its contention that there is a meaningful difference between its "part-time" and "full-time" classifications. Construing the evidence in the light most favorable to Lono, Nakasone and Lono did equal work irrespective of their classification. Nakasone's salary of $24,133—which Nakasone describes as "part-time"—from prior to the two coaches splitting the position is more than Lono's "part-time" salary of $22,308 when she was the sole Head Coach. ECF No. 55-5 at PageID.742. Lono received $22,803 starting on August 3, 2021 (with back pay to July 1, 2020), through to November 15, 2022, when she received a raise to $28,416.67. ECF No. 45-4 at PageID.407, 433. At least for the period of July 1, 2020, to November 15, 2022, Lono made less than Nakasone. Nakasone may therefore be an appropriate comparator.

HPU then argues that Nakasone is not similarly-situated because he was subordinate to Sam Moku while Lono was subordinate to Conching and Snell. But "[t]he Ninth Circuit does not apply a rigid 'same supervisor' requirement in determining whether employees are similarly situated; employees who had

different supervisors but who were subject to the same rules and standards may be similarly situated." *Kocsis v. Delta Air Lines, Inc.*, 963 F. Supp. 2d 1002, 1013 (D. Haw. 2013) (citing *Earl*, 658 F.3d at 1115).

Because Lono established her prima facie case, the burden shifts to HPU to put forward a legitimate, non-discriminatory reason for its actions. HPU puts forward one such reason: Lono "confirmed that she worked part-time hours and refused to work full-time." ECF No. 44-1 at PageID.209. But Lono has identified male coaches—Nakasone and Tumaneng—who attested that they worked part-time hours and received the full salaries designated for Head Coach positions, so Lono turning down a full-time classification should not necessarily have precluded her from receiving the full salary for the Women's Softball Head Coach position.

Thus, even if the court accepts that HPU put forth a legitimate, non-discriminatory reason for paying less to Lono, that reason fails to withstand scrutiny—viewing the evidence in the light most favorable to Lono, it is "unworthy of credence." *Vasquez*, 349 F.3d at 641. Summary judgment is denied as to Counts II and V.

**B.     Counts I, III and IV – Equal Pay and Wage Discrimination**

**1.     *Legal Framework***

Employers may not pay employees of one sex less than employees of the other sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1).  In an Equal Pay Act case, the plaintiff has the burden of establishing a prima facie case by showing that "the employer pays different wages to employees of the opposite sex for substantially equal work."  *Rizo v. Yovino*, 950 F.3d 1217, 1222 (9th Cir. 2020) (en banc) (quoting *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986)).  The prima facie case is limited to a comparison of the jobs in question, and does not involve a comparison of the skills and qualifications of the individuals holding the jobs.  *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 914 (9th Cir. 1983) ("The statute explicitly applies to jobs that require equal skills, and not to employees that possess equal skills.").  And, "[u]nlike Title VII, the EPA does not require proof of discriminatory intent. . . . For that reason, the familiar three-step *McDonnell Douglas* framework that applies to Title VII claims is not used in EPA cases."  *Rizo*, 950 F.3d at 1223.

If a plaintiff puts forth a prima facie case, the burden shifts to the employer to show that the wage differential is justified under one of the EPA's affirmative defenses: "(i) a seniority system; (ii) a merit system; (iii) a system

which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."[5] *Id.* at 1222 (quoting 29 U.S.C. § 206(d)(1)) (alteration omitted).

In construing discrimination claims brought under HRS § 378–2, Hawaii courts look "to the interpretations of analogous federal laws by the federal courts for guidance." *Hollister v. Mrs. Gooch's Nat. Food Markets, Inc.*, 919 F. Supp. 2d 1101, 1106 (D. Haw. 2013) (quoting *Shoppe v. Gucci Am.,* 94 Hawaii 368, 377, 14 P.3d 1049, 1058 (2000)).

### 2. *Application*

At this summary judgment stage, Lono met her prima facie case under the EPA, which requires showing that she does "substantially equal work" to employees of the opposite sex. She has provided evidence that the Volleyball, Basketball and Softball coach positions are similar—the job postings required identical qualifications and had identical responsibilities. *See generally* ECF No. 55-22 at PageID.859–861 (Volleyball); ECF No. 55-23 at PageID.862–864 (Basketball); ECF No. 55-24 at PageID.865–867 (Softball); *see also* ECF No. 55-3 at PageID.708 (Conching attesting that all Head Coaches work under similar conditions). She has also provided evidence that the amount of work is similar:

---

[5]  The fourth exception "allows employers to justify wage disparities between employees of the opposite sex based on any job-related factor other than sex."  *Rizo*, 950 F.3d at 1229.  Pay associated with prior employment does not qualify as a job-related factor under this test.  *Id.*

The three teams had similar numbers of practices and games.  *See generally* ECF No. 55-25, ECF No. 55-26, and ECF No. 55-27 (providing the number of volleyball games played over the past three years); ECF No. 55-28, ECF No. 55-29, and ECF No. 55-30 (basketball games); ECF No. 55-31, ECF No. 55-32, and ECF No. 55-33 (softball games); ECF No. 55-34 (volleyball practices); ECF No. 55-35 (basketball practices); ECF No. 55-36 (softball practices).  She has also provided evidence that the male employees who were classified as "full-time" did not perform more duties than her because of that classification.  *See* ECF No. 55-2 at PageID.715 (Lono attesting that she accomplished all of the job duties Head Coach position while working part-time); ECF No. 55-3 at PageID.731 (Interim Athletics Director Conching attesting to same); ECF No. 55-4 at PageID.734 (Tumaneng attesting that his duties as a "full-time" and "part-time" coach were identical); ECF No. 55-5 at PageID.743 (Nakasone attesting that he always worked "part-time" when he was employed as the Head Coach).  Lono has made her prima facie case under the EPA.

HPU argues that it had "other non-discriminatory reasons" for its actions, which the court construes as an argument under the fourth affirmative defense under the EPA, "a differential based on any other factor other than sex."  *Rizo*, 950 F.3d at 1222.  HPU's arguments are "(1) Plaintiff confirmed that she was working less than the required 988 hour per year for part-time employees; (2)

Plaintiff refused a promotion to a full-time position with full-time pay; (3) Plaintiff has less relevant sport-specific experience than the Comparators."  ECF No. 44-1 at PageID.213.

HPU's first two "factor[s] other than sex" are linked to its "part-time" and "full-time" classification system.  As previously explained, this system does not provide a rationale for the pay differential given that two male employees— Nakasone and Tumaneng—attested to working part-time hours for full-time pay. Though Lono stated that she was working less than the 988 hour/year requirement for part-time employees, the record does not show how many hours the male coaches worked when receiving their "full-time" pay.  Because they, too, might have been working less than 988 hours, Lono working less than 988 hours does not necessarily justify the difference in pay.  HPU's second factor—that Lono refused a promotion to a full-time position with full-time pay—also fails to explain the pay differential.  Again, if Nakasone and Tumaneng worked part-time hours and received the full salary of a Head Coach, Lono should have received the full salary irrespective of her classification.

HPU's third and final argument for this affirmative defense is that Lono has less "relevant sport-specific experience" than the Comparators.[6]  ECF

---

[6] HPU does not specify which EPA exception this defense falls under.  Although the court analyzes it under the fourth exception ("a differential based on any other factor other than

(continued . . . )

No. 44-1 at PageID.212–213, ECF No. 45-3 at PageID.235–236 (Snell attesting that "relevant experience" was a factor in HPU's compensation decisions). "[C]oaches with substantially more experience and significantly superior qualifications" may be paid more without violating the EPA. *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1075 (9th Cir. 1999). HPU would have to show by a preponderance of the evidence that the employees' experience levels were "markedly different." *See id.* (holding that a pay differential was justified where the male comparator had thirty-one years of experience compared to plaintiff's seventeen, and had additional experience that plaintiff lacked, including Olympic coaching experience, nine years of marketing experience, and authorship of numerous books on basketball).

But HPU has not met its burden of establishing that Tumaneng and Nakasone had "substantially more experience" than Lono, or that this factored into its salary determinations. *Id.* Lono attests that she has been working as a volunteer

---

sex"), HPU might have intended it to fall under the "merit" or "seniority" exceptions. 29 U.S.C. § 206(d)(1); ECF No. 44-1 at PageID.212–213; ECF No. 45-3 at PageID.236. In order to establish a merit or seniority defense, HPU must identify predetermined criteria of merit or seniority that were applied to determine pay. *See Maxwell*, 803 F.2d at 447 (a merit defense requires showing "an organized and structured procedure whereby employees are evaluated systematically according to predetermined criteria") (citation omitted); *Kent-Friedman v. N.Y. State Ins. Fund*, 2023 WL 6292693, at *18 n.17 (S.D.N.Y. Sept. 27, 2023) (An employer seeking to establish a seniority defense "must be able to identify standards for measuring seniority which are systematically applied and observed.") (citing *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)).

There is no evidence in the record of such criteria—when asked how skills and experience factored into compensation decisions, HPU's Rule 30(b)(6) deponent stated that she did not know. ECF No. 55-59 at PageID.967.

coach or assistant coach for the HPU Women's Softball program since 2000, and as a paid assistant coach since 2016, for around twenty hours per week.  ECF No. 55-2 at PageID.702–703.  She became co-Head Coach in 2017, and sole Head Coach since 2020.  She therefore had twenty years of coaching experience within the HPU Women's Softball program (i.e. at the collegiate level) when she accepted the Head Coach position.[7]  *Id.* at 702–704, 715–717.  In comparison, Tumaneng attested that when he was hired in 2017, he had four years of experience coaching at the collegiate level and "many years" of coaching at the high school level.  ECF No. 55-4 at PageID.741.  Nakasone's experience level prior to his employment at HPU is not clear from the record, but even if he had "14+" years of collegiate coaching experience prior to his retirement in 2023, as HPU attests, *see* ECF No. 45-1 at PageID.232, this would not establish he had substantially more collegiate experience than Lono, who had twenty years.[8]

---

[7]  HPU argues, based on a declaration from its Assistant Vice President of Human Resources, Bert Shimabukuro, that Lono had less "full-time collegiate" experience ("4+ years") than Tumaneng ("5+ years") and Nakasone ("14+ years"), as of August 1, 2023.  ECF No. 45-1 at PageID.231–232.  But as previously explained, it is not clear what the "full-time" classification means at HPU, and Shimabukuro's statements conflict with other parts of the record.  *See, e.g.*, ECF No. 55-4 at PageID.741 (Tumaneng declaring he had four years of collegiate experience when hired in 2017, giving him approximately ten years of experience by 2023); ECF No. 55-2 at PageID.702–704 (Lono attesting to twenty years of collegiate coaching experience in 2020, giving her twenty-three years of experience in 2023).  Regardless, at this summary judgment stage, the court views the evidence in the light most favorable to Lono, not HPU.

[8]  Shimabukuro attested that Nakasone had "14+ years" or experience as of August 1, 2023.  ECF No. 45-1 at PageID.231–232.  There is no other evidence in the record as to

(continued . . . )

Even if Nakasone or Tumaneng had more experience than Lono, the record contains no evidence that HPU factored experience into its wage decisions in a systematic manner.  All of HPU's 30(b)(6) deponents testified that they did not know what factors were used to determine Nakasone's pay as Head Coach.  *See* ECF No. 55-59 at PageID.971; ECF No. 55-60 at PageID.1047; ECF No. 55-61 at PageID.1082.  Nakasone attested that when he and Lono became co-Head Coaches, there was no discussion of "experience," and each of them received the same $16,000 wage.  ECF No. 55-5 at PageID.743.

If experience was a factor in HPU's salary decisions, it is HPU's burden to come forth with evidence explaining how that factor was applied to determine salary differentials.  HPU has not met its burden and therefore has not established an affirmative defense under "any other factor other than sex."  29 U.S.C. § 206(d)(1).  The court denies summary judgment on Counts I, III, and IV.

## C.   Counts VI and VII – Retaliation

### 1.   *Legal Standards*

Lono brings retaliation claims under federal law (the Fair Labor Standards Act ("FLSA")) and state law (the Hawaii Whistleblowers Protection Act

---

Nakasone's years of experience before his date of hire at HPU.  Even Nakasone's date of hire is unclear.  ECF No. 60-10 at PageID.1154 (employment form showing Nakasone was hired in 2011); ECF No. 45-4 at PageID.254 (Lono attesting that Nakasone became head coach in 2008–2009 school year).

("HWPA")).  To prevail under the FLSA, Lono must first make a prima facie

showing that: (1) she engaged in activity protected by the FLSA; (2) HPU took an

adverse employment action; and (3) there was a causal link between the protected

activity and the adverse action.  *See, e.g.*, *Stewart v. Masters Builders Ass'n of*

*King & Snohomish Cntys.*, 736 F. Supp. 2d 1291, 1295 (W.D. Wash. 2010).  If a

plaintiff meets the standard, the burden shifts to the employer to offer a legitimate,

non-discriminatory reason for the adverse action.  *Id.*  Thereafter, the burden shifts

back to the plaintiff to demonstrate that the employer's reason is pretextual.  *Id.*

> And the HWPA provides:
>
> An employer shall not discharge, threaten, or otherwise
> discriminate against an employee regarding the employee's
> compensation, terms, conditions, location, or privileges of
> employment because:  (1)  The employee, or a person acting on
> behalf of the employee, reports or is about to report to the
> employer, or reports or is about to report to a public body,
> verbally or in writing, a violation or a suspected violation of:
> (A)  A law, rule, ordinance, or regulation, adopted pursuant to
> law of this State, a political subdivision of this State, or the
> United States . . . .

HRS § 378-62(1)(A).

> An HWPA claim has three requirements that mirror the requirements

under the FLSA.  An employee must have "engaged in protected conduct," the

employer must "take some adverse action," and "there must be a causal connection

between the alleged retaliation and the whistleblowing."  *Tagupa v. VIPdesk, Inc.*,

125 F. Supp. 3d 1108, 1119 (D. Haw. 2015) (citing *Griffin v. JTSI, Inc.*, 654 F.

Supp. 2d 1122, 1131 (D. Haw. 2008)) (internal quotations omitted); *Crosby v. State Dep't of Budget & Fin.*, 76 Haw. 332, 341, 876 P.2d 1300, 1309 (1994) (the HWPA provides protection to employees from "any form of retaliation by their employers" including "discharge, discrimination, and other forms of adverse action").

### 2. *Application*

In her FLSA retaliation claim, Lono alleges that (1) she undertook a protected activity by asking HPU for the internal complaint procedures in connection with her claim for equal pay, and (2) HPU took an adverse action by manufacturing "bogus, non-existent" policies related to golf-cart driving and volunteers during the "Maintenance Day," and by using "lies" to give Lono a bad review.  ECF No. 1 at PageID.23; ECF No. 54 at PageID.676.  Lono also alleges, under the HWPA, that these two incidents constituted retaliation against her in her conditions or privileges of employment because she opposed HPU's alleged practice of giving unequal pay and reported HPU to the EEOC.  ECF No. 1 at PageID.23–24.  Lono describes her HWPA claim as "identical" to her federal retaliation claim.  ECF No. 54 at PageID.677.

Both of Lono's retaliation claims fail at this summary judgment stage. Even assuming (without deciding) that Lono engaged in protected activity, there is no evidence in the record suggesting that she suffered an adverse employment

action as a result of the Maintenance Day or the Performance Review.  *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) ("[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity.").

No evidence suggests that Lono suffered any negative consequences from the Maintenance Day incident—she was given a raise and promoted to full-time Head Coach.  Furthermore, HPU has provided evidence that its actions were in line with university policy.  HPU provided a Driver Certification Policy dated August 12, 2020.  ECF No. 60-12 at PageID.1156.  The policy appears to predate the Maintenance Day, showing it was not "manufactur[ed]" by HPU to target Lono.  ECF No. 54 at PageID.676.  HPU also provided what appears to be a current Volunteer Coach policy (undated), ECF No. 60-13 at PageID.1173, and a copy of a July 31, 2020 email in which Lono acknowledged the need for volunteers to sign volunteer forms on an annual basis—demonstrating that Lono was aware that a volunteer policy was in effect, ECF No. 60-15 at PageID.1193.  Snell requiring Lono to adhere to university policies, even if Lono had not been so required before, is not an adverse action.

Turning to the Performance Review, Snell gave Lono an overall "Good Performance/Performance Meets Expectations" rating, 0.8 points lower than her previous review.  *Compare* ECF No. 45-4 at PageID.577, *with* ECF No.

55-54 at PageID. 953.  But because there is no evidence of a negative consequence to Lono from this review, it does not rise to the level of an adverse action.  *See Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002) (holding that where an employee had not alleged that mediocre evaluations were accompanied by any meaningful change in work assignments, those mediocre evaluations did not rise to the level of an adverse employment action) (citing *Kortan v. Calif. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (similar)).

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the court DENIES Defendant HPU's Motion for Summary Judgment, ECF No. 44, as to Counts I–V, but GRANTS the Motion as to Counts VI and VII.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 13, 2024.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Lono v. Hawaii Pacific University*, Civ. No. 22-00400 JMS-WRP; Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, ECF No. 44